# UNITED STATES DISCTRICT COURT
## DISTRICT OF MASSACHUSETTS

ROBERT BECOTTE,

     Plaintiff,

     v.

THE COOPERATIVE BANK,

     Defendant.

Civil Action No.

## COMPLAINT AND DEMAND FOR JURY TRIAL

This is an action for damages brought pursuant to the whistleblower protection provisions of the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010, 12 U.S.C. § 5567 and the Financial Institutions Reform, Recovery and Enforcement Act, 12 U.S.C. § 1831j.

### PARTIES

1.    Plaintiff Robert Becotte ("Mr. Becotte") is an individual residing in Newburyport, Massachusetts and a former employee of Defendant, The Cooperative Bank ("Defendant" or "Bank").  Mr. Becotte worked for the Bank from his hire, in September 1997, until the Bank terminated his employment on January 17, 2014.  Mr. Becotte last held the position as Defendant's Senior Vice President and Chief Financial Officer.

2.    Defendant is a Massachusetts banking corporation with a usual place of business in Roslindale, Massachusetts.  The Bank is a full-service bank offering or providing consumer financial products or services.  The Bank is the product of a 1998 merger between the Roslindale

Cooperative Bank and the Charlestown Cooperative Bank.  The Bank is governed by a Board of Directors.

JURISDICTION AND VENUE

3.      Plaintiff Robert Becotte is a resident of the Commonwealth of Massachusetts.

4.      Defendant is a Massachusetts cooperative bank with a principal place of business of 40 Belgrade Avenue, Roslindale, Massachusetts.

5.      This Court has jurisdiction over Plaintiff's claims pursuant to 12 U.S.C. § 5567(c)(4)(d)(i) as Mr. Becotte filed a timely complaint with the Secretary of Labor and more than 210 days have elapsed without a formal order.  The Court also has jurisdiction under 28 U.S.C. § 1331 because the complaint presents a federal question.

6.      Venue is proper within this district pursuant to 28 U.S.C. § 1391(b)(1) and (2) because Defendant resides in this judicial district and because the events giving rise to this claim arose in this judicial district.

FACTS

7.      Defendant employed Mr. Becotte from September 1997 until January 17, 2014. Over his sixteen-year tenure with the Bank, Mr. Becotte served in several important managerial roles—as Senior Vice President, Compliance Officer, Treasurer, and Chief Financial Officer. Mr. Becotte's job responsibilities included overseeing the loan credit analysis department, overseeing the operations of the accounting department, managing cash and investments, reporting and monitoring financial risks, and managing the Bank's internal and external auditors and regulatory examiners.  Throughout his tenure with the Bank, Mr. Becotte's performance reviews were uniformly positive.

8.      In 2007, Mr. Becotte became aware of certain improprieties engaged in by certain Bank officials, and began reporting his concerns to his superiors.

9.      In 2007, Mr. Becotte learned that the then-president ("President #1") was utilizing a Bank credit card for personal purposes without reimbursing the Bank.  Mr. Becotte addressed his concerns with (1) the President #1 himself, (2) then-Board chair William O'Neill ("Mr. O'Neill" or "O'Neill"), and (3) FDIC and Massachusetts Department of Banking representatives during a Bank examination.  President #1 was thereafter removed from office and prohibited from working in the banking industry.

10.      The removed president was replaced as Bank president by President #2 in September 2007.

11.      In the Fall of 2011, the Board hired an outside firm, WTK Associates, Inc., to conduct an assessment of candidates to succeed President #2 as President and CEO.  The firm considered only two internal candidates and one external candidate—Mr. O'Neill.  Mr. O'Neill, who was Chairman of the Board at the time, was a dentist and had no banking experience.  At the time, the CEO position description required a minimum of twelve years of experience in financial institution management. The Board revised the CEO position description to eliminate the banking experience requirements, allowing Mr. O'Neill to be considered for the position.

12.      Upon information and belief, the WTK assessment concluded that Mr. O'Neill was not qualified for the position of President and CEO, but it nonetheless developed a Management Succession Plan ("Plan") to assist Mr. O'Neill in ascending to the presidency.  The Plan called for Mr. O'Neill to step down as Chairman of the Board in the Spring of 2012 and to become Executive Vice President of the Bank under President #2 in the Fall of 2012.  The Plan essentially provided for Mr. O'Neill to work as President #2's understudy until Mr. O'Neill

would officially take over as President and CEO of the Bank on January 1, 2013.  The Plan

included a consultative role for President #2 as an officer throughout 2013.

13.     In accordance with the Plan, Mr. O'Neill stepped down as Chairman of the Board

in March 2012 and the Board elected Joseph Cefalo, Jr. ("Mr. Cefalo") as his replacement.  After

President #2 announced the Plan to employees, members of senior management requested a

meeting with Mr. Cefalo.  All members of senior management, except President #2, attended the

meeting and voiced their concerns about the process and selection of Mr. O'Neill as the next

Bank President and CEO.  The members of senior management expressed a lack of confidence in

the selection of O'Neill, and presented the concerns orally to Mr. Cefalo.  Upon information and

belief, Mr. Cefalo did not present the concerns of senior management to the full Board of

Directors at that time.

14.     On June 14, 2012, Mr. Becotte and six other senior managers formally protested

the selection of Mr. O'Neill as President #2's successor by signing a letter addressed to Board

Chairman Cefalo.  The letter announced a Vote of No Confidence by senior management in the

selection of O'Neill as Bank President and CEO.  The letter included a list of reasons for the No

Confidence vote: the flawed hiring system that allowed O'Neill to be selected (including the

failure to post the job as required per HR policy or consider other candidates), O'Neill's lack of

banking experience and job qualifications, violation of the Bank's conflict of interest and self-

dealing policies, and potential regulatory and reputational risks to the Bank.  The letter noted that

the selection of an unqualified President and CEO exposed the Bank to lawsuits and regulatory

issues, and put the Bank in violation of its own Code of Ethics.  The letter requested a meeting

with the full Board to discuss the letter.  A copy of the June 14, 2012 letter is attached here as

Exhibit A.

4

15.     In Spring 2012, Mr. Becotte became aware that President #2 was misusing his office by placing secret holds on other depositors' bank accounts when his own account lacked sufficient funds to cover his transactions.  Mr. Becotte and John Lynch (Vice President and Senior Commercial Loan Officer) addressed the matter initially with Bank Vice President and Audit Manager, Brian Mahoney in April 2012.  Later Mr. Mahoney and Mr. Becotte brought it to the attention of Mr. Cefalo.  During this conversation Mr. Mahoney, Mr. Becotte and Mr. Cefalo also discussed the fact that President #2 did not work full days, despite being paid to do so..  Upon information and belief, in 2009 the Board had required President #2 to purchase cellphone because the Board members were having difficulty reaching him during regular business hours.  Mr. Becotte also provided information about these matters to FDIC and Massachusetts Department of Banking representatives during an ensuing examination.

16.     The April 2012 disclosure by Mr. Becotte and Mr. Lynch about President #2's check cashing activities prompted an internal investigation by Mr. Mahoney.  The investigation found over 700 instances where President #2 cashed checks using holds on Bank employees' deposits, including over 440 instances where he cashed checks totaling over $350,000 on Mr. O'Neill's account alone.  These findings were subsequently corroborated and verified by an external Special Audit conducted by Shatswell, MacLeod & Company, P.C.

17.     A Special Board meeting was held on July 3, 2012.  At the meeting, the Board voted to suspend President #2 and appoint Mr. O'Neill as acting President and CEO.  Upon information and belief, Mr. Cefalo did not present the June 14th No Confidence letter from senior management to the full Board at the July 3rd meeting, or at subsequent Board meetings on July 11, August 8, or August 22, 2012.  At the Board's August 22nd meeting, the Board voted to terminate President #2 and it appointed Mr. O'Neill as Bank President and CEO.

5

18.     On information and belief, in October 2012, Mr. O'Neill recommended and the Board approved an increase in Mr. Cefalo's monthly stipend from $1,750 to $2,500 per month ($9,000 per year). On information and belief, the increase in compensation was not discussed or reviewed by the Corporate Governance Committee, as required by Bank policy, before being put before the Board.

19.     On October 22, 2012, Mr. O'Neill reduced Mr. Becotte's salary by $15,000 and reduced Mr. Becotte's job duties by eliminating his designation as Compliance Officer and attendant duties, despite noting on the same form that Becotte's overall performance "meets expectations."  At the same time Mr. Becotte received a 3% salary increase. In a statement accompanying the salary reduction, Mr. O'Neill wrote that Becotte "must verbalize his allegiance to the TCB team, the CEO included."  A copy of the October 22, 2012 Salary Adjustment Recommendation and accompanying letter is attached hereto as Exhibit B.

20.     Throughout late 2012 and 2013, Mr. O'Neill criticized and disparaged Mr. Becotte's work to others, and on September 30, 2013 gave Mr. Becotte his first negative performance review.  Mr. Becotte responded to the accusations in the performance review by letter dated October, 16, 2013.  A copy of the performance review and Mr. Becotte's response is attached hereto as Exhibit C.  Mr. O'Neill was eventually terminated as President.

21.     On January 17, 2014, Mr. Becotte was terminated from his employment after 16 years with the Bank.  Mr. Becotte was informed of his termination by another Board member and interim president of the Bank, Thomas Barnes ("Mr. Barnes" or "Barnes").  Mr. Barnes stated the reasons for the termination as Mr. Becotte's performance and the necessity of the Bank to "take a different direction."  The reasons given for the termination of Mr. Becotte's employment were and are pretextual.

22.     In or about March 2013 the FDIC and the Massachusetts Division of Banks issued Safety and Soundness Report of Examination. Pursuant to the findings of the Report, the Bank's Board of Directors signed a Memorandum of Understanding with the FDIC and the Massachusetts Division of Banks in September 2013.  On information and belief, the Report found that the Bank lacked adequate whistleblower protections.

23.     Plaintiff is a "covered employee" within the meaning of 12 U.S.C. § 5567(b) because he was employed by Defendants as an "individual performing tasks related to the offering or provision of a consumer financial product or service."

24.     Defendant is a "covered person" within the meaning of 12 U.S.C. § 5567, in that the Bank engages in offering or providing consumer financial products or services within the meaning of 12 U.S.C. § 5481(6).

25.     Plaintiff provided information about secret holds on depositors accounts to his employer and to government officials at a time when he reasonably believed that placing holds on depositors accounts could cause inconvenience to Bank customers in violation of §501(b) of Graham Leach Bliley Act, 15 U.S.C. §6801.

26.     Plaintiff provided information about secret holds on depositors accounts to his employer and to government officials at a time when he reasonably believed that placing holds on depositors accounts created an interest free loan in violation of the disclosure requirements of the  Truth in Lending Act, 15 U.S.C. §§ 1631, 1638, and TILA Regulation Z, 12 C.F.R. §§ 1026.17 and 1026.18.

27.     Plaintiff provided information about secret holds on depositors accounts to his employer and to government officials at a time when he reasonably believed that placing holds

on depositors accounts violated the overdraft disclosure regulations of the Truth in Savings Act, 12 C.F.R. § 1030.11.

28.     Plaintiff provided information about secret holds on depositors accounts to his employer and to government officials at a time when he reasonably believed that placing holds on depositors accounts created an unsafe and unsound business practice and an unwarranted extension of credit to a bank executive in violation of FDIC Rules, 12 C.F.R. § 337.3.

29.     Plaintiff provided information about President #2's excess compensation to his employer and to government officials at a time when he reasonably believed that President #2 was receiving excess compensation in violation of FDIC Rules, 12 C.F.R. Pt. 364, App. A., III. A.

30.     Plaintiff objected to the Plan for presidential succession at a time when he reasonably believed that the Plan violated the managerial and operational standards of FDIC Rules, 12 C.F.R. Pt. 364, App. A., II. A and the excess compensation standards of FDIC Rules, 12 C.F.R. Pt. 364, App. A., III. A.

31.     Plaintiff objected to the elimination of the experience qualification and the elevation of Mr. O'Neill to the position of President and CEO at a time when he reasonably believed that the elevation of Mr. O'Neill to the position of President and CEO violated the operational and managerial standards of FDIC Rules, 12 C.F.R. Pt. 364, App. A, II.A.

### FIRST CAUSE OF ACTION

32.     The allegations of paragraphs 1 through 31 of this Complaint are incorporated herein by reference.

33.     Defendant violated 12 U.S.C. § 5567 because its termination of Plaintiff's employment was motivated in whole or in part by the fact that he provided "information to the

employer" and to an "other…governmental authority" regarding conduct he reasonably believed to be violations of law.

### SECOND CAUSE OF ACTION

34.     The allegations of paragraphs 1 through 33 of this Complaint are incorporated herein by reference.

35.     The Bank is an insured depository institution within the meaning of the Financial Institutions Reform, Recovery and Enforcement Act (FIRREA), 12 U.S.C. § 1814.

36.     Mr. Becotte was an employee of the Bank within the meaning of FIRREA, 12 U.S.C. § 1831j.

37.     Mr. Becotte provided information to a Federal banking agency.

38.     Mr. Becotte's reduction in pay and his discharge were directly and proximately related to his providing information about possible violations of law to the Federal Deposit Insurance Corporation.

39.     The termination of Mr. Becotte's employment and his reduction in pay violated the provisions of FIRREA, 12 U.S.C. § 1831j.

### JURY DEMAND

Plaintiff demands a trial by jury on all issues factual issues raised by the pleadings.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff Becotte respectfully prays for this Court's judgment against Defendant as follows:

A.  Reinstating Robert Becotte to his position at the Bank with the same seniority and status he would have had  but for the unlawful retaliation pursuant to 12 U.S.C. § 5567(c)(4)(D)(ii)(I); and

B.  Awarding Plaintiff back pay including benefits with interest pursuant to 12 U.S.C. § 5567(c)(4) (D)(ii)(II); and

C.  Awarding Plaintiff special damages sustained as a result of the retaliation including litigation costs, expert witness fees, and reasonable attorneys' fees pursuant to 12 U.S.C. § 5567(c)(4) (D)(ii)(III); and

D.  Awarding Plaintiff such further relief as may be necessary to make him whole, including injunctive relief and compensatory damages pursuant to 12 U.S.C. § 5567(c)(4) (D)(ii).

E.  Reinstating Robert Becotte to his position at the Bank with the same seniority and status he would have had  but for the unlawful retaliation pursuant to 12 U.S.C. § 1831j(c)(1); and

F.  Directing the Bank to pay Plaintiff compensatory damages pursuant to 12 U.S.C. § 1831j(c)(2); and

G.  Awarding Plaintiff such further relief as may be necessary to remedy any past discrimination pursuant to 12 U.S.C. § 1831j(c)(3).

Respectfully submitted,
ROBERT BECOTTE,

By his attorneys,
  __/s/ Paul F. Kelly_____
Paul F. Kelly, BBO #267000
Kevin C. Merritt, BBO #667537
SEGAL ROITMAN, LLP
111 Devonshire Street, 5th Fl.
Boston, MA 02109
(617) 742-0208
pkelly@segalroitman.com
kmerritt@segalroitman.com

March 12, 2015