UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 15-10812-RGS

ROBERT BECOTTE

v.

THE COOPERATIVE BANK

MEMORANDUM AND ORDER ON
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

March 6, 2017

STEARNS, D.J.

Robert Becotte, reported management lapses at the Cooperative Bank to state and federal regulators and fellow Bank officers and, by his accounts, was fired for his deeds. He alleges wrongful retaliation by the Bank in violation of the Financial Institutions Reform, Recovery and Enforcement Act (FIRREA), 12 U.S.C. § 1831j, and the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010 (CFPA), 12 U.S.C. § 5567. The Bank claims that Becotte was terminated for reasons that have nothing to do with his purported whistleblowing. It now moves for summary judgment. [1]

BACKGROUND

---

[1] The Bank also asserts a technical defense to the CFPA allegation, which will be discussed in due course.

The plausible facts, taken in the light most favorable to Becotte as the nonmoving party, are as follows.  In 1998, the Cooperative Bank was born out of the merger of Roslindale Cooperative Bank and Charlestown Cooperative Bank.  Becotte moved to the new Bank as its Treasurer and Chief Financial Officer (CFO), titles that he held throughout his tenure.  In 2004, Becotte took on the additional duties of Chief Compliance Officer (CCO), which he performed until 2012.  Becotte received excellent performance reviews, and in most years, merit-based salary increases.

In 2011, then Bank President John McCarthy nominated Becotte as one of three potential candidates to succeed him.  Acting on the recommendation of an outside consulting firm, McCarthy passed over Becotte and elevated Board Chairman William O'Neill.  The following year, Becotte was removed as CCO and, as a result, saw a $15,000 reduction in his annual salary.[2]  On January 17, 2014, the Bank terminated Becotte.

The backstory is as follows.  In 2006, Becotte learned that then Bank President Paul Ladouceur was using a Bank credit card for personal expenses.  Believing this to violate the banking laws as well as internal Bank

---

[2] The loss in salary was offset by a three percent merit raise, resulting in a net annual loss of $9,548 in compensation.

policy, Becotte raised his concerns directly with Ladouceur.  He also reported the misuse of the credit card to Eugene Blumenrich, the Bank's attorney, and to the then Board of Directors (Joseph Cefalo, Frances Giannakopoulos, and William O'Neill).

In 2007, the Federal Deposit Insurance Corporation (FDIC) and Massachusetts Division of Banks (MDoB) conducted a Safety and Soundness Examination of the Bank.  Becotte spoke to the examiners about Ladouceur's misfeasance.  At some point, the examiners located a letter written by Blumenrich to the Bank's bonding company.  The letter characterized Ladouceur's failure to reimburse the Bank as an "innocent lack of attention." Becotte told the examiners that, in his view, the letter was an attempt to whitewash Ladouceur's misconduct.[3]

In the fall of 2011, the Board hired consultants WTK Associates, Inc. (WTK), to evaluate the three potential successors to then President

---

[3] The meeting minutes of the Board of Directors show an awareness of Becotte's disclosures to the bank examiners about Ladouceur's credit card abuses (although they disagreed with the wisdom of informing the Bank's bonding company).  The Board eventually terminated Ladouceur and the FDIC banned him from the banking industry for "violations of law, unsafe or unsound banking practices, and/or breaches of fiduciary duty."  FDIC Order – Dkt #58-3.

McCarthy.  WTK gave high marks to Becotte, noting that he

> has demonstrated the ability to oversee the financial accounting, financial reporting, and budgeting/forecasting of the Bank, as well as the other areas for which he has responsibility.  He has done so with the level of performance that provides safety and soundness, supporting the other areas of the Bank as required.  He also appears to have the skill-set or many of the key characteristics required to satisfy the position requirements of the President and CEO of the Bank.

Def.'s Ex. 7 at 7 (Dkt #27-7).[4]

The third candidate, William O'Neill, the Chairman of the Board, was a practicing dentist on the verge of retirement.  Were he to be chosen, WTK recommended a transition plan that would allow O'Neill to apprentice with McCarthy until January of 2013, when he would become full-time President and CEO.  In addition, the plan contemplated that McCarthy would remain with the Bank as a Senior Vice President during the remainder of 2013 to assist O'Neill as needed.

In March of 2012, several of the Bank's senior managers met with Joseph Cefalo, the new Board Chairman, to voice misgivings about the

---

[4] McCarthy selected Becotte as one of the three candidates.  Becotte testifies that he did not apply to be a candidate and "had an open selection process been employed, [he's] not sure he would have applied."  Becotte Aff. ¶ 7 (Dkt #52).

selection of O'Neill, "a dentist without banking experience."  The managers presented Cefalo with a memorandum detailing their concerns.  After the meeting, Cefalo forwarded the memo to Becotte and Internal Auditor Brian Mahoney with the instruction to "burn it."  Becotte Aff. ¶ 10; Mahoney Aff. ¶ 5.

In June of 2012, Becotte approached Cefalo to press the issue of the managers' continuing concerns about O'Neill's sub-par performance.  Told to put it in writing, Becotte hand-delivered a "No Confidence Letter" to Cefalo just prior to the June 14, 2012 meeting of the Board.  *See* Def.'s Ex. 1 at 13.  The letter was signed by seven members of senior management and requested a meeting with the Board.  No meeting occurred and neither Cefalo nor any other member of the Board responded to the Letter.[5]

In the spring of 2012, Bank employees, including Brian Mahoney, sought out Becotte to report a pattern of unusual check cashing by President McCarthy.  In April of 2012, another senior manager told Becotte that McCarthy had been "frequently seen stuffing cash into his pockets at the teller windows."  Becotte Aff. ¶ 12.  Becotte asked Mahoney to review

---

[5] Director Robert Norberg later testified that he saw the No-Confidence Letter as nothing more than Becotte's "sour grapes" for having been passed over as Bank President.  Norberg Dep. at 41-42.

McCarthy's history of cash transactions at the Bank.  The review revealed that McCarthy had cashed a large number of checks against employees'' accounts.  Although Becotte had given McCarthy permission on a few occasions in 2008 to use his own account to cash checks, he revoked his authorization in 2009, when he discovered that McCarthy had occasionally used the account without his knowledge.  Two other Bank employees (Judy Butler in 2010 and Jack Lynch in 2011) complained to Becotte when McCarthy asked to use their personal accounts to cash checks.[6]

Most of McCarthy's checks appeared to have been cashed against Chairman O'Neill's account.   O'Neill and McCarthy were friendly and socialized both in and outside the Bank, so at that time Becotte did not know whether O'Neill had authorized McCarthy to use his account.   Mahoney and Becotte met with Cefalo to express their concerns about McCarthy's check cashing habits, his limited work hours and general unavailability to employees, and the lack of employee confidence at the prospect of O'Neill becoming the permanent President and CEO.   On July 3, 2012, after

---

[6] Becotte does not dispute that McCarthy's asking employees for permission to cash checks against their accounts did not violate Bank policy, or any state or federal law or regulation.

reviewing Mahoney's summary of McCarthy's check cashing activity, the Board suspended McCarthy and named O'Neill as acting President.

At the direction of the Audit Committee, O'Neill hired an outside accountant, Shatswell McCleod & Company, to compile an inventory of McCarthy's irregular cash withdrawals.   The review, which was completed in August of 2012, identified 735 checks, totaling in excess of $590,000 that McCarthy had cashed by placing holds on employee accounts.  The majority of the checks — 480 totaling in excess of $350,000 — were cashed using O'Neill's account.  O'Neill told the auditors that he was unaware of McCarthy's activity involving his account.   *See* Pl.'s Ex. 7.  The auditors' report, however, listed instances in which O'Neill had accompanied McCarthy to the teller window to authorize the cashing of a check.[7]  The report also found checks cashed by McCarthy that had been endorsed by O'Neill.[8]

---

[7] Mahoney testified that O'Neill, despite being implicated in the check cashing scheme, had designated himself the contact person for the auditors and had met with them on a daily basis.  Mahoney at one point expressed his concern to Glenn McCleod that the "independence of the review was [being] compromised by O'Neill's involvement."  Mahoney Aff. ¶ 14.

[8] Becotte claims that the Board submitted the Shatswell report to the FDIC without management's review.  While the Board ultimately permitted managers to read the report, it did so under a requirement of strict

The Board terminated McCarthy on August 22, 2012, and made O'Neill full-time President and CEO.[9]  In August of 2012, the Bank's senior managers were summoned to a meeting with the Board of Directors.  According to Becotte and Mahoney, "during the meeting Cefalo read management the riot act about having to bring up issues with banking regulators.  Cefalo said something to the effect of 'if this happens again, heads will roll.'"  Becotte Aff. ¶ 17; Mahoney Aff. ¶ 17.   Mahoney further testified that "after the check-cashing incident, the Board became both dismissive and hostile to Becotte in Audit Committee meetings." Mahoney Aff. ¶ 19. He understood "that the Board blamed Becotte for events leading to the dismissal of McCarthy." *Id.*

In September of 2012, Cefalo circulated a questionnaire among Bank managers asking when they first became aware of the McCarthy check-cashing scheme.[10]  Shortly thereafter (in October 0f 2012), O'Neill and Cefalo

---

confidentiality.  After his own reading of the report, Becotte wrote a letter to the Board pointing out the report's "many mistakes and inaccuracies." Becotte Aff. ¶ 15; s*ee* Pl.'s Ex. 8.

[9] The Board did not fill McCarthy's intended transitional role as Senior Vice President of Risk Management and advisor to O'Neill.

[10] Reilly testified that it "was his understanding that Cefalo was upset because someone had spoken to the FDIC about McCarthy."  Reilly Aff. ¶ 12.

stripped Becotte of his duties as CCO officer and reduced his salary.  O'Neill wrote a letter to the Board faulting Becotte for his "indefensible" failure to take action earlier in the McCarthy matter.  *See* Def.'s Ex. 1-B (Dkt #27-1 at 15.).  After acknowledging Becotte's "strong understanding of the financial aspects of banking" and the positive views held by outside vendors of his "financial acumen," O'Neill proposed that Becotte "continue to serve as the CFO with some changes in his job description and his assurance of his corporate fidelity." *Id.*  At the October 2012 Board meeting, a motion was made and seconded to terminate Becotte's employment, although it did not pass.[11]

The FDIC and MDoB conducted another Safety and Soundness examination of the Bank in the first quarter of 2013.  Becotte was interviewed by the examiners about McCarthy's check cashing scheme.  Becotte also complained to the examiners about

> the Board's penchant for selecting third-party firms to legitimize Board decisions, Cefalo's failure to disclose material information about management's concerns to the full Board, the Board's succession planning and relationship with WTK, McCarthy's compensation for hours he did not work, the selection of O'Neill as president, the no confidence letter, the shortcomings of the

---

[11] Norberg testified that while O'Neill supported Becotte's termination, he delayed in firing him because he wanted "a month or so to kind of get his feet wet."  Norberg Dep. at 58.

Shatswell Report, and board fees.

*Id.* ¶ 20.  According to Becotte, the bank examiners knew none of this prior to his disclosures, including the "lack of CEO oversight, and of the Bank's weak whistle blowing procedures." *Id.*  In May of 2013, the examiners shared their preliminary findings with the Board.

After reviewing the examiners' concerns, the Board hired two outside consultants – Phillip O'Connor to evaluate the operational practices of the Bank, and Thomas Grottke of Northeaster Banking Services Group to review corporate governance and management.  One of the issues Grottke addressed was Becotte's continued viability as both Treasurer and CFO.  As part of his assessment, Grottke identified potential replacement candidates for the position of CFO, one of whom was Phillip O'Connor.[12]

In July of 2013, the FDIC issued its Report of Examination (ROE).[13] The ROE faulted the Board's oversight of the Bank and for inadequate succession planning, noting that the Directors, not McCarthy, had a fiduciary

_____

[12] Despite his serving as an outside consultant for the Bank, O'Connor eventually accepted the Board's invitation to replace Becotte.

[13] According to Becotte, the FDIC and MDoB finished the Safety and Soundness Examination of the Bank in March of 2013, but withheld publication of the ROE until the summer of 2013.

duty to select candidates for WTK to assess.  The FDIC also criticized Cefalo for failing to promptly share the mangers' No-Confidence Letter with the Board to provide them "the opportunity to review the letter and address the concerns raised by the senior management team prior to the appointment of Mr. O'Neill as acting and then permanent CEO."  ROE at 5.  The ROE noted that the Bank had failed to put in place whistleblower procedures that might have led to an earlier exposure of McCarthy's check-cashing scheme.[14]

After issuing the ROE, the FDIC and MDoB took informal corrective action in the form of a Memorandum of Understanding (MOU) that the Bank signed in September of 2013.  The MOU required the Bank to take steps to improve the integrity and competence of the Board and the Bank's management.

The Bank responded by hiring an outside firm, RMPI Consulting, to develop a management plan addressing the requirements of the MOU.  John Gallo, a principal at RMPI,[15]  developed the plan by reviewing documents,

---

[14] On November 18, 2013, the FDIC banned McCarthy from the banking industry because of his "violations of law and/or regulation, unsafe or unsound banking practices, and/or breached of fiduciary duty . . . [involving] personal dishonesty . . . and/or willful continuing disregard for the safety and soundness of the Bank."  Pl.'s Ex. 9.

[15] Gallo had offered Barnes a job in 2012, which he declined.  In 2013,

and surveying and interviewing Board members and senior management.[16]
Becotte Aff. ¶ 21.   Becotte alleges that directors Barnes and Cefalo heavily
influenced Gallo's work – that he regularly consulted with them, allowed
them to review his draft report, and accepted and incorporated their
comments and changes.   Barnes Dep. at 99, 106; Cefalo Dep. at 90, 97; Gallo
Dep. at 108.

In its final report to the Board, RMPI concluded that Becotte did "not
appear to have the combination of leadership and analytical skills to be the
Bank's [CFO] at this time."[17]   Def.'s SOF ¶ 29.   RMPI recommended that the
Bank "immediately dismiss Mr. Becotte as CFO of The Cooperative Bank."

---

Barnes solicited Gallo to submit a bid on the development of the
management plan for the Bank.   Barnes Dep. at 26.

[16] In or about August of 2013, the Bank issued a formal response to the
ROE.   Becotte states that he reviewed the Bank's response on September 11,
2013, and recalls "that the Directors took issue with the regulators' findings
about the Board [and] expressed dissatisfaction that the regulators collected
information about the Directors from Bank management and staff without
speaking to the Directors directly."   *Id.*

[17] Specifically, RMPI found Becotte's "standard monthly report package
. . . was limited and perfunctory," lacking "profitability analysis, both at the
product and customer level."   *Id.* ¶ 30.   RMPI also recommended O'Neill be
replaced.   The Board accepted the recommendation and terminated him.
O'Neill Dep. at 130-131.

*Id.*

On January 17, 2014, the Bank terminated Becotte.  Thomas Barnes, the acting President and CEO, told Becotte that the Bank had decided to change direction and that his termination was based on "performance." Becotte Aff. ¶ 23.  On May 15, 2014, Becotte filed a charge with the Secretary of Labor (through the Occupational Safety and Health Administration), pursuant to 12 U.S.C. § 5567, alleging that his termination was in retaliation for his whistleblowing.  After more than 210 days elapsed without any formal action by the Secretary, on March 12, 2015, Becotte filed this lawsuit in the federal district court.  On February 2, 2017, the court heard oral argument on the Bank's motion for summary judgment.

## DISCUSSION

Summary judgment is appropriate when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2); *McGrath v. Tavares*, 757 F.3d 20, 25 (1st Cir. 2014) (The district court awards summary judgment only if it concludes that "the record shows there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of

law."). A court's obligation at the summary judgment stage is to determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-252 (1986).

FIRREA

An insured depository institution violates FIRREA when it "discharges or otherwise discriminates against any employee because the employee . . . provides information to any Federal Banking agency or the Attorney General regarding –

(A) a possible violation of any law or regulation; or

(B) gross mismanagement, a gross waste of funds, an abuse of authority, or a substantial and specific danger to public health and safety by the depository institution or any director, officer or employee of the institution.

12 U.S.C. § 1831j(a)(1). FIRREA whistleblower protections do not encompass internal complaints made to institutional management. *Lippert v. Cmty. Bank, Inc.,* 438 F.3d 1275, 1279-1280 (11th Cir. 2006). FIRREA, however, explicitly adopts the whistleblower friendly burdens of proof set out in the Whistleblower Protection Act (WPA). 5 U.S.C. § 1221(e)(1); 12 U.S.C.

§ 1831j(f).  Under the WPA, an employee need only prove that his complaint

was "a contributing factor" in the adverse personnel action.  *Id.*

> The employee may demonstrate that the disclosure was a
> contributing factor in the personnel action through
> circumstantial evidence, such as evidence that —
>
> (A)   the official taking the personnel action knew of the
>        disclosure; and
>
> (B)   the personnel action occurred within a period of time such
>        that a reasonable person could conclude that the disclosure
>        was a contributing factor in the personnel action.

*Id.*  While "a contributing factor" is not further defined in the WPA, several

courts have taken language from the WPA's legislative history defining it as

"any factor which alone, or in connection with other factors, tends to effect,

in any way, the outcome of the decision." *See Marano v. Dep't of Justice,* 2

F.3d 1137, 1140 (Fed. Cir. 1993), quoting 135 Cong. Rec. 5033 (1989)

(Explanatory Statement on S.20).  "[A] whistleblower need not demonstrate

the existence of a retaliatory motive on the part of the employee taking the

alleged prohibited personnel action in order to establish that his disclosure

was a contributing factor to the personnel action."  *Id.* at 1141.  Once a

plaintiff establishes a prima facie case under the WPA, the burden shifts to

the defendant to prove "by clear and convincing evidence that it would have

taken the same personnel action in the absence of such disclosure." 5 U.S.C.

§ 1221(e)(2).

The Bank moves for judgment on Becotte's FIRREA claim asserting that it acted on the neutral recommendation of RMPI, its outside consultant in terminating Becotte.   It also argues that Becotte has failed to show a sufficient temporal connection between his complaints to the Board and his termination to compensate for an alleged lack of direct evidence of retaliation.

For his part, Becotte notes that there is no dispute regarding his reporting of McCarthy's check cashing scheme to the FDIC and the MDoB, his complaints about the Board's failure to properly oversee the internal management of the Bank, and the "flawed" selection of O'Neill as the Bank's president and CEO, the disgruntlement of senior managers at the decision, the failure of Chairman Cefalo to bring critical information to the attention of the Board, the Board's use of supposedly independent outside consultants "to legitimize [its] decisions," and former president McCarthy's various shortcomings.   Pl.'s Statement of Facts (SOF) ¶ 34.   There is also evidence in the record of anger on the part of Cefalo and the Board in general at Becotte's disclosures to the examiners and at his persistent complaints to the Bank's

16

officers and directors.[18] Finally, there is a dispute of fact regarding the timing between the complaints and disclosures and Becotte's firing.[19]

Turning to the Bank's temporal proximity argument, only where "an employee relies solely on a chronological relationship" to establish causation must temporal proximity be "very close." *Murray v. Warren Pumps, LLC,* 821 F.3d 77, 87-88 (1st Cir. 2016), quoting *Ahern v. Shinseki*, 629 F.3d 49, 58 (1st Cir. 2010); *see also Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001) (per curiam) (if temporal proximity is the only evidence of causality establishing prima facie retaliation, proximity must be "very close"; twenty months is insufficient).   As Becotte has marshalled direct and circumstantial evidence, as well as temporal proximity in support of his claim, his prima facie case of retaliation is well made.

As the Bank's position that it relied on RMPI's recommendation in terminating Becotte easily satisfies its burden of production, the court will

---

18 While the Bank argues that Becotte failed to provide the FDIC with any information it did not know, counsel agree that a prior disclosure is not a bar to a retaliation claim under FIRREA (as it would be in a *qui tam* setting).

19 The Bank argues that an interval of nearly eight months between Becotte's reporting and his termination – Becotte says the lapse was six months.

turn directly to Becotte's evidence of pretext.   Becotte points to RMPI's Gallo's testimony that he based his termination recommendation on Becotte's failure to submit a timely budget to the Board, and that had he been made aware that the Board itself had voted to delay the budget, his recommendation that Becotte be terminated would likely have been different.  *Id.* ¶ 29; Gallo Dep. at 139-140.  Becotte notes that his termination was not mentioned in the first ten drafts of Gallo's report, and surfaced only in the 11th draft. *Id.*  Becotte notes that the only intervening circumstance concerning Becotte that occurred between drafts was a meeting Gallo had with Cefalo and Barnes.  *Id.*  Becotte contends that the likely influence of Barnes and Cefalo on Gallo's recommendation (particularly given the history of Cefalo's hostility towards him) presents a question of fact for the jury. While the issue is a close one, given the FIRREA's relatively lenient contributing factor test, *see* 5 U.S.C. § 1221(e)(1), I agree.

CFPA (Dodd-Frank)

The CFPA "is a comprehensive act that enumerate[s] eighteen federal consumer financial laws that are to be implemented and enforced by the Consumer Financial Protection Bureau [CFPB]."[20]  The Act "provides for

---

20 Among the laws subject to the jurisdiction of the CFPB are the

employee protection from retaliation because the employee has engaged in protected activity pertaining to the offering or provision of consumer financial products or services," and also "protects a covered employee's activity relating to any provision of law that is subject to the jurisdiction of the Bureau." 12 U.S.C. § 5567(a)(1). The Act instructs the CFPB to take action "to prevent a covered person or service provider from committing or engaging in an unfair, deceptive, or abusive act or practice under Federal law in connection with any transaction with a consumer for a consumer financial product or service." 12 U.S.C. § 5531.

A covered employer, such as the Bank, violates the CFPA if it

> terminate[s] or in any other way discriminate[s] against . . . any
> covered employee . . . by reason of the fact that such employee . .
> . has – (1) provided [or] caused to be provided . . . information to
> the employer, the Bureau, or any other State local, or Federal,
> government authority or law enforcement agency relating to any
> violation of, or any act or omission that the employee reasonably

---

Electronic Fund Transfer Act (establishing consumer rights for participants in electronic fund transfer systems by, among other things, placing limits on consumers' liability for unauthorized account withdrawals), the Gramm-Leach-Bliley Act (requiring financial institutions to protect the security of and against unauthorized access to customer records and information), the Truth in Savings Act (requiring the disclosure of terms and conditions of depository accounts), the Fair Credit Reporting Act (requiring, among other things, financial institutions to establish programs to detect and prevent fraud and identity theft in opening and maintaining accounts), certain parts of the Federal Deposit Insurance Act, and the Expedited Funds Availability Act. *See* 12 U.S.C. §§ 5481(12).

> believes to be a violation of, any provision of this title or any other
> provision of law that is subject to the jurisdiction of the
> [Consumer Financial Protection] Bureau, or any rule, order,
> standard, or prohibition prescribed by the Bureau.

12 U.S.C. § 5567(a)(1).   The CFPA, unlike FIRREA, covers internal complaints made to the employer.   As under FIRREA, the complainant's protected activity need only be a contributing factor in the adverse employment action. 12 U.S.C. §5567(c)(3).   Moreover, "prior knowledge of the protected conduct by a decision maker has been held in multiple cases to be evidence of a causal link to an adverse action."   Nick M. Beermann, *Understanding SOX Whistleblower Protections*, 2016 WL 3476537, at *n.26 (May, 2016) (Thomson Reuters).

It is undisputed that Bank officers and the Board knew that Becotte had made internal complaints to Cefalo about both McCarthy and O'Neill (as well as complaints to the FDIC and the MDoB).   All Board members eventually knew of the senior managers' No-Confidence Letter, and several expressed the belief that the Letter had been fomented by Becotte.   Becotte argues that, apart from violating various banking regulations, McCarthy's placing holds on depositors' accounts "created interest free loans in violation of Truth-in-Lending Act"; "caused inconvenience to Bank customers in

20

violation of Graham Leach Bliley Act"; and "violated the overdraft disclosure regulations of the Truth in Savings Act."  Compl. ¶¶ 25-27.

In response, the Bank raises what on the surface appears a hair-splitting objection, but on closer examination is grounded in the wording of the CFPA itself.  The protections of the CFPA are triggered when a service provider "offers or provides to a consumer any financial product or service not in conformity with Federal consumer financial law."  12 U.S.C. §5536. The Bank argues that while Becotte may have flagged potential violations of state and federal law involving McCarthy and O'Neill, these did not amount to a "transaction with a consumer," because their account holds and check cashing concerned employee accounts and not those of customers.

This argument raises three questions:  Who is a consumer under the CFPA?  Is an employee of the Bank who is also an account holder a consumer within the meaning of the CFPA? In either case, must the transaction impact the consumer directly or is a transient interference with a consumer's ownership rights in his or her account sufficient for CFPA purposes?

The first question is easily answered.  In that the CFPA does not give the word consumer a technical definition, the court presumes that Congress meant the ordinary meaning to apply, that is, a consumer is a person who

acquires a good or service for personal use.[21]  The second question can be answered narrowly given the fact that the Bank is organized as a cooperative institution.  All of the depositors of a cooperative bank are member-owners of the bank.  Consequently, there is no basis for distinguishing, as the Bank does, between employee deposit accounts and other customer accounts. Finally, given the intent of Congress that the Act be liberally interpreted, it would seem that the impact of wrongdoing on the consumer need not be permanent, but need only interfere in some tangible way with consumer's rights in the account.  Again, while the issue is a reasonably close one as a matter of law, the court will resolve it in Becotte's favor as the nonmoving party.

ORDER

For the foregoing reasons, the motion for summary judgment on Becotte's claims under FIRREA and the CFPA are <u>DENIED</u>.  The Clerk will set the case for trial.

SO ORDERED.

/s/ Richard G. Stearns

_____

---

[21] It will be remembered that a deposit is a liability, not an asset of a bank, in the sense that it is a debt owned by the depositor.  Hence, it qualifies as a "good."

UNITED STATES DISTRICT JUDGE